## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| **KEVIN DOYLE,** | \* | |
| | \* | |
| *Plaintiff,* | \* | **CASE NO:** |
| | \* | |
| *v.* | \* | **COMPLAINT** |
| | \* | |
| **3M COMPANY and AEARO** | \* | |
| **TECHNOLOGIES LLC** | \* | **Jury Trial Demanded** |
| | \* | |
| *Defendants* | \* | |
| | \* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### COMPLAINT AND JURY DEMAND

Plaintiff, Kevin Doyle, tenders the following Complaint and Jury Demand against Defendants, 3M Company and Aearo Technologies LLC (collectively "*Defendants*") for compensatory and punitive damages, equitable relief, and such other relief deemed just and proper, arising from the injuries to Plaintiff as a direct and proximate result of Defendants' designing, developing, testing, assembling, manufacturing, packaging, labeling, preparing, distributing, marketing, supplying, warranting and/or selling dual-ended Combat Arms™ Earplugs (Version 2 CAEv2) (hereinafter "Combat Arms™ Earplugs"), a defective device. Plaintiff brings the action, and alleges the following, based on information and belief, the investigation of counsel, and personal knowledge:

## NATURE OF THE ACTION

1.      This case arises from a defective earplug manufactured by Defendants and sold to the United States military for use by American soldiers both at home and abroad, in training and in conflicts and when stationed outside the United States.    Plaintiff was issued a set of Defendants' defective dual-ended Combat Arms™ Earplugs (Version 2 CAEv2) in or about 2004.  Plaintiff used the earplugs as instructed during training and when deployed abroad and, as a result of the defective condition, now suffers from tinnitus and hearing loss.

2.      Defendants knew the earplugs were defective and possessed this knowledge prior to the selling these earplugs.  In an effort to qualify for a multi-million dollar per-year contract with the United States, Defendants falsified test results and misrepresented the performance specifications of the Combat Arms™ Earplugs.

## PARTIES

3.      Plaintiff Kevin Doyle, is a citizen and resident of New Orleans (Orleans Parish), Louisiana.

4.      Plaintiff enlisted in the Armed Services of the United State, and was issued and used the defective Combat Arms™ Earplugs beginning in or about 2003 until approximately 2010.

5.      Defendant 3M Company ("3M") is a Delaware corporation with its principal place of business at 3M Center, St. Paul, Minnesota 55144.  Defendant 3M is a citizen of Delaware and/or Minnesota.

6.      Defendant Aearo Technologies LLC, ("Aearo") is a limited liability company formed in Delaware with its principal place of business at 5457 W. 79th Street, Indianapolis, Indiana 46268.  Defendant Aearo is a citizen of Delaware and/or Indiana.

7.      Among other things, Defendants are in the business of designing, manufacturing, marketing, and selling worker safety products, including hearing protection products, including the dual-ended Combat Arms™ Earplugs.

8.      Defendants do business in every state, including Louisiana, by advertising, promoting, marketing, distributing, and selling of Combat Arms™ Earplugs.

9.      At all relevant times, Defendants were engaged in the business of developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce throughout the United States, either directly or through third parties, subsidiaries or related entities, the Combat Arms™ Earplugs.

## JURISDICTION & VENUE

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) as there is complete diversity between Plaintiff and Defendants, and the amount in controversy exceeds $75,000, exclusive of costs and interest.

11.     This Court has personal jurisdiction over Defendants because they regularly conduct business in Louisiana, and have sufficient minimum contacts with Louisiana. Defendant intentionally availed themselves of this jurisdiction by marketing and selling products, including Combat Arms™ Earplugs; have registered agents for service of process in Louisiana; and a substantial part of the events and omissions giving rise to Plaintiff's causes of action occurred in this federal judicial district, the Western District of Louisiana.

12.     Venue is proper under 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims occurred and/or emanated from this District, and Defendant has caused harm in this District.

## FACTUAL ALLEGATIONS

**Plaintiff's Military Service**

13.     Plaintiff enlisted in the United States Marine Corp in 1993 and transitioned to the United States Army where he became a certified weapons instructor and achieved the rank of Sargent prior to his honorable discharge in 2010.

14.     Before joining the military, Plaintiff had no signs or symptoms of hearing loss, nor other ear- or hearing-related injuries.

15.     Plaintiff was first provided the standard issue, dual-ended 3M Combat Arms™ Earplugs prior to his deployment t for use during pre-deployment training, and during subsequent his deployment to the Middle East.

16.     Plaintiff wore the dual-ended Combat Arms™ Earplugs while in training for, and during his deployment, service as a certified weapons instructor and various other combat roles.

17.     Plaintiff was never instructed to fold back the flanges on the opposite side of use of the earplug.

18.     During both his training and deployments, serving as a certified weapons instructor and various other combat roles, Plaintiff was exposed to loud, high-decibel noises and explosions, from training exercises prior to and subsequent to deployment.

20.     Plaintiff continued to wear the defective Combat Arms™ Earplugs for the remainder of his service, causing injuries to his ears and hearing.

21.     In 2014, following his discharge Plaintiff was diagnosed with bilateral tinnitus and hearing loss.

**Aearo's Combat Arms™ Earplugs**

22.     Aearo Technologies was the global market leader in hearing and eye protection with its principle place of business in Indianapolis, Indiana.

23.     Aearo Technologies developed, marketed, and sold the Combat Arms™ Earplug until being acquired by 3M in 2008 for $1.2 billion. Afterwards, 3M hired Aearo's employees and continues to maintain Aearo Technologies LLC as a subsidiary operating unit.

24.     Post-acquisition, the Combat Arms™ Earplugs have been marketed and sold under the 3M brand.

25.     Because 3M acquired both the assets and liabilities of Aearo, Aearo and 3M are used interchangeably and all allegations against Aearo are directed as a matter of law against 3M.

26.     Aearo developed dual-ended, non-linear (selective attenuation) Combat Arms™ Earplugs for the specific purpose of providing ServiceMembers a single set of earplugs that provides two options for hearing attenuation depending on how they are worn.



27.     The Combat Arms™ Earplugs can be worn with the yellow end placed in the ear — the "open" or "unblocked" position — which Defendants maintain blocks, or at least significantly reduces, loud impulse sounds commonly associated with military service, while still allowing Servicemembers to hear quieter noises such as commands spoken by fellow Servicemembers and/or approaching enemy combatants.

28.     Alternatively, Defendants maintain that wearing the Combat Arms™ Earplugs with the green end placed in the ear — the "closed" or "blocked" position — blocks, or at least significantly reduces, all sounds, i.e., operate as ordinary earplugs.

**Indefinite-Quantity Contracts**

29.     Based on the supposed technological design and qualities of the Combat Arms™ Earplugs, won Defendants a series of Indefinite-Quantity Contracts ("IQCs") to be the exclusive supplier of selective attenuation earplugs to the U.S. military between 2003 and 2012.

30.      To win these IQCs, Defendants represented that the Combat Arms™ Earplugs would meet specific performance criteria established by the U.S. Government as a prerequisite for bidding on the IQC for earplugs.

31.     The value and effectiveness of earplugs has been standardized under federal law through a Noise Reduction Rating ("NRR").

32.     The testing and labeling of earplugs — such as the Combat Arms™ Earplugs — to determine an NRR is governed by federal regulations promulgated by the Environmental Protection Agency ("EPA") pursuant to the Noise Control Act, 42 U.S.C. § 4901, *et seq*.

33.     Specifically, 40 C.F.R. §211.206-1 provides:

The value of sound attenuation to be used in the calculation of the Noise Reduction Rating must be determined according to the "Method for the Measurement of Real-Ear Protection of Hearing Protectors and Physical Attenuation of Earmuffs." This standard is approved as the American National Standards Institute Standard (ANSI-STD) S3.19-1974….

34.     The NRR is supposed to represent the amount of sound attenuation experienced by a test group under conditions specified by the federal Noise Control Act's testing methodology.

35.      The U.S. military may only purchase earplugs that meet the testing standards established by the U.S. Army Public Health Command, Army Hearing Program, or equivalent

standards that may be established by other branches of the military. Any such standards are tied to the NRR achieved under the EPA regulations.

36.     Further, 40 C.F.R. §211.204-4 mandates that specific information accompany hearing protection devices sold in the United States, including instructions as to the proper insertion of the earplugs:

> §211.204-4.    The following minimum supporting information must accompany the device in a manner that insures its availability to the prospective user. In the case of bulk packaging and dispensing, such supporting information must be affixed to the bulk container or dispenser in the same manner as the label, and in a readily visible location.
> …
> §211.204-4(e) Instructions as to the proper insertion or placement of the device.

**Aearo Deliberately Falsified Test Results for the Combat Arms™ Earplugs**

37.     At all times, Defendants' performance representations were false; and Defendants knew them to be false. In fact, Defendants knew these earplugs were defective and did not work as they were supposed to as early as 2000, well before Defendants became the exclusive supplier of selective attenuation earplugs to the U.S. military.

38.      At all relevant times, the Combat Arms™ Earplugs  had a dangerous design defect that caused them to imperceptibly loosen in the wearer's ear, thus allowing damaging sounds to enter the ear canal around the outside of the earplug. Specifically, the basal edge of the third flange of the non-inserted end of the earplug is prone to press against some wearers' ear canals and fold back to its original shape, thereby loosening the seal in their ear canals

39.     The symmetrical design of the earplug meant that this design defect would occur whether a user inserted the earplugs in the blocked or unblocked potion.

40.     Aearo learned of this design defect when it completed testing of the Combat Arms™ Earplugs.

41.     In or around January 2000, Aearo began NRR testing on each end of the Combat Arms™ Earplugs. Rather than use an independent test lab, Aearo performed its testing in-house at its E-A-RCAL laboratory (also now owned by 3M). Aearo selected 10 test subjects, including some of its own employees. Aearo's test protocol involved testing: (1) the subject's hearing without an earplug; (2) the subject's hearing with the open/unblocked (yellow) end of the Combat Arms™ earplug inserted; and (3) the subject's hearing with the closed/blocked (green) end of the Combat Arms™ earplug inserted.

42.     Aearo's own employees monitored the test results as the tests were performed, which allowed them to stop the testing at any point if they were not achieving the desired NRR. This violated the ANSI S3.19-1974 testing protocol. In fact, Aearo stopped the test of the green end of the Combat Arms™ Earplug inserted after only 8 of the 10 subjects had been tested. At that point, the Combat Arms™ Earplugs were failing expectations miserably. Aearo was expecting to achieve an NRR of 22 with the green end inserted, but in fact was on target to receive a 10.9 rating based on the experiences of the first eight subjects. These disappointing results were caused by the design defect described above.

43.     Despite stopping the test on the green end of the Combat Arms™ Earplug, Aearo had the remaining two test subjects complete the test with respect to the yellow end of the Combat Arms™ Earplugs only because Aearo liked the low NRR rating the test was indicating to that point. After completion, however, testing of the yellow end resulted in an NRR of -2, which falsely suggested that the earplugs actually amplified sound. Aearo thus knew that the test

was inaccurate and needed to be repeated. Instead, Aearo changed the -2 NRR to a 0 NRR, and used that rating on its labels.

44.     After prematurely stopping the NRR test of the green end of the Combat Arms Earplug, Aearo investigated the unfavorable test results and discovered that because the stem of the earplug was so short, it was difficult to insert the earplug deep enough into the wearer's ear canal to obtain a proper fit as required by ANSI S3.19-1974, Section 3.2.3. (*See,* Acoustical Society of America Standard Method for the Measurement of Real-Ear Protection of Hearing Protectors and Physical Attenuation of Earmuffs (ASA STD 1-1975))

45.     Aearo also discovered that when the green end of the Combat Arms™ Earplug was inserted into the ear using the standard fitting instructions, the basal edge of the third flange of the yellow end pressed against the wearer's ear and folded backward. When the inward pressure of the earplug was released, the yellow flanges tended to return to their original shape, thereby loosening the earplug, often imperceptibly to the wearer. And, because the Combat Arms earplug was symmetrical, this same problem occurred when the earplug was reversed.

46.     In, or around, February 2000, after the Combat Arms™ Earplugs first failed the specification testing, Aearo employees rolled back the non-inserted yellow flanges to mitigate the loosening effect of the defect.

47.     Aearo manipulated the test protocol by instructing the test subjects to fold the flanges on the non-inserted end of the earplug back before inserting it into the ear.

48.     Using the manipulated fitting instructions, Aearo re-tested the green end of the Combat Arms™ Earplugs starting in February 2000. During this re-test of the green end, test subjects folded back the yellow flanges of the earplug (essentially elongating the too- short defective stem to allow them to insert the earplugs deeper into their ears to obtain a proper fit.

Because the yellow flanges were folded back, the basal edge of the third flange no longer pressed against the subject's ear canal, and thus did not cause the earplug to loosen during the testing. Using this manipulated test protocol, Aearo achieved a 22 NRR on the green end of the Combat Arms™ Earplug.

49.     Due to the symmetrical nature of the Combat Arms™ Earplugs, the design defect that affected the fit of the green end similarly affected the fit of the yellow end. The fact that Aearo's testing of the yellow end resulted in a -2 NRR meant that the earplugs did not provide a proper fit (as required by ANSI S3.19-1974, Section 3.2.3) between the ear canal of at least some of the subjects and the earplugs. As a result, some subjects had large standard deviations across trials on the yellow end test, which suppressed the NRR rating.

50.     Nevertheless, Aearo did not re-test the yellow end using the manipulated fitting instructions like it did on the green end, i.e., folding back the flanges on the green end of the earplug before inserting the yellow end into the ear.

51.     Aearo did not re-test the yellow end because it knew that it would not be able to obtain a 0 NRR (much less the facially invalid -2 NRR) and further knew the 0 NRR was a major selling point to the U.S. military. An accurate NRR for the yellow end, which would have been higher than 0, would have rendered the Combat Arms™ Earplugs less suitable to the U.S. military because the military would have known that the earplugs would impair communication.

52.     Moreover, the defect in the Combat Arms™ Earplugs is more likely to manifest itself during military activities than in a lab where the NRR tests are performed over the span of just a few minutes and the head of the test subject remains virtually motionless during the test. Servicemembers, on the other hand, may wear the earplug for an extended period of time and are more active than test subjects in a lab.

53.     Because the defect was imperceptible to the wearer, Defendants' design defect went undetected for more than a decade by the U.S. military and those who wore them. It is thus not surprising that hearing damage is now the largest ongoing medical cost the military incurs each year. (*See*, David E. Gillespie, *Researchers Evaluate True Effects of Hearing Loss for Soldiers* (Dec. 16, 2015), available at *http://www.army.mil/article/160050/Researchers_ evaluate _true_effects_of_hearing_loss for_soldiers/* (last accessed April 18, 2019).)

54.     The VA thus spends more than $1 billion per year to treat hearing damage suffered by more than 800,000 Servicemembers. (*Id.*; *see als*o, Kay Miller, *Hearing loss widespread among post-9/11 vetera*ns, The Center for Public Integrity (Aug. 29, 2013), available at *http://www.publicintegrity.org/2013/08/29/13283/hearing-loss-widespread-among-post-911-veterans* (last visited April 18, 2019) ("The most-widespread injury for [post-9/11] veterans has been hearing loss and other auditory complications.... Hearing maladies cost more than $1.4 billion in veterans' disability payments annually, according to first year 2010 data from the Hearing Center of Excellence, a part of the Department of Defense.").)

**Defendants' False Certifications to the U.S. Military**

55.     In 2003, Aearo submitted a bid in response to the U.S. military's Request for Proposal ("RFP") to supply large quantities of Combat Arms™ Earplugs. The RFP required bidders to certify that the earplugs complied with the Salient Characteristics of Medical Procurement Item Description ("MPID") of Solicitation No. SP0200-06-R-4202. In its bid, Aearo certified the Combat Arms™ Earplugs complied with the Salient Characteristics of MPID, even though Aearo knew that certification to be false.

56.     The pertinent Salient Characteristics of MPID in each RFP, in relevant part, were:

2.1.1. Ear plugs shall be designed to provide protection from the impulse noises created by military firearms, while allowing the wearer to clearly hear normal speech and other quieter sounds, such as voice commands, on the battlefield.

2.2.2 The sound attenuation of both ends of the ear plugs shall be tested in accordance with ANSI S3.19....

2.4. <u>Workmanship</u>. The ear plugs shall be free from all defects that detract from their appearance or impair their serviceability.

2.5. <u>Instructions</u>. Illustrated instructions explaining the proper use and handling of the ear plugs shall be supplied with each unit...

(*See*, Solicitation No. SP0200-06-R-4202, at 41-42. )

57.     Aearo k n e w that its test protocol did not comply with ANSI S3.19 but nevertheless certified that its testing was fully compliant with the U.S. military's specifications.

58.     Aearo also falsely certified that it provided accurate "instructions explaining the proper use and handling of the ear plugs." Aearo knew when it did so that its own testing had revealed a design defect that needed modified fitting instructions to ensure a proper fit that would deliver the promised NRR. At no time did Defendants disclose the modified fitting instructions to the U.S. military—even after winning the bid.

59.     Pursuant to Section 2.4 of the MPID, Aearo was required to certify that the "ear plugs shall be free from all defects that detract from their appearance or impair their serviceability." (*See*, Solicitation No. SP0200-06-R-4202, at 41-42. ) Despite Aearo knowing since 2000 that its Combat Arms™ Earplugs suffered from a design defect, Aearo certified to the U.S. military that its earplugs had no defects.

60.     Based on its facially invalid test results, Aearo falsely reported to the U.S. military that the yellow end of its Combat Arms™ Earplugs had a 0 NRR, which would allow ServiceMembers to freely communicate with their fellow ServiceMembers and avoid any impairment to hear enemy combatants.

61.     Aearo also certified that the green end of its Combat Arms™ Earplugs had a 22 NRR, even though Aearo did not disclose the modified fitting instructions necessary to achieve the hearing protection afforded by a 22 NRR. (*See*, Combat Arms™ Earplugs Instructions). Nothing in these fitting instructions disclosed that it was necessary to fold back the flanges of the opposite end to ensure a proper fit and achieve the promised NRR. By failing to provide this disclosure, Aearo falsely overstated the amount of hearing protection afforded by the green end of the earplug and overstated the benefits of the yellow end of the earplug.

62.     Based on Aearo's false representations, its bid was the prevailing bid and Aearo entered into the first of a series of IQCs later that year making it the exclusive provider of selective attenuation earplugs to the U.S. military.

63.     In subsequent years in response to additional RFPs, Defendants re-certified that the Combat Arms™ Earplugs met the MPID criteria, even though Defendants knew that to be false.

64.     In total, the U.S. military purchased enough Combat Arms™ Earplugs to provide one pair to every Servicemember deployed each year in major foreign engagements from 2003 through 2015. (*See*, McIlwain, D. Scott, *et al., Heritage of Army Audiology and the Road Ahead: The Army Hearing Program*, AMERICAN JOURNAL OF PUBLIC HEALTH, Vol. 98 No. 12 (Dec. 2008)).

65.     Defendants continued to sell the Combat Arms™ Earplugs to the U.S. military until late 2015, at which time Defendants discontinued the earplug. (*See*, Discontinuation: 3M Combat Arms™ Earplugs Version 2 (Nov. 17, 2015)). Defendants did not recall the earplugs despite discontinuing them due to the design defect.

66.     Defendants' misrepresentations about the benefits and protections provided by the Combat Arms™ Earplugs caused Plaintiff to suffer bilateral tinnitus and assymetric hearing loss (Right Ear Hearing Loss).

67.     At all times after 3M's acquisition of Aearo, 3M knew of, conspired with, and was complicit in Aearo's wrongful acts in marketing and selling the Combat Arms™ Earplugs without disclosing the defect or the modified fitting instructions.


## TOLLING OF STATUTES OF LIMITATIONS

68.     Under the Servicemembers Civil Relief Act, the period of Plaintiff's military service may not be included in computing any statute of limitations applicable herein. *See* 50 U.S.C. § 3936.

69.     Plaintiff could not, by the exercise of reasonable diligence, have discovered Defendants' wrongful acts as the cause of his injuries at an earlier time, because, at the time of these injuries, the cause was unknown to Plaintiff.  Plaintiff did not suspect, nor did Plaintiff have reason to suspect, the cause of these injuries, or the tortious nature of the conduct causing these injuries, until less than the applicable limitations period prior to the filing of this action.

70.     Further, the running of the statute of limitations has been tolled by reason of Defendants' fraudulent concealment. Through their affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiff the risks associated with the defects in the Combat Arms™ Earplugs.

71.     As a result of Defendants' actions, Plaintiff was unaware, and could not reasonably know or have learned, through reasonable diligence, that he had been exposed to the

defects and risks alleged herein, and that those defects and risks were the direct and proximate result of Defendants' acts and omissions.

72.     Through Defendants' affirmative misrepresentations and omissions pertaining to the s a f e t y  and  efficacy  of  the  Combat  Arms™  Earplugs,  Plaintiff  was  prevented  from discovering  this  information  sooner  because  Defendants  misrepresented  and  continued  to misrepresent the defective nature of the Combat Arms™ Earplugs.


## COUNT I:
## NEGLIGENCE


73.     Plaintiff  incorporates  by  reference  the  paragraphs  above  as  if  fully  set  forth herein.

74.     Defendants  each  had  a  duty  to  use  their  professional  expertise  and  exercise  that degree of skill and learning ordinarily used under the same or similar business by a person or entity in Defendants' business of designing, developing, testing, manufacturing, marketing, and distributing hearing protection devices.

75.     Defendants further had a duty to comply with the certifications Defendants made to the U.S. government about the qualities and performance characteristics of its product, the Combat Arms™ Earplugs. Plaintiff, a foreseeable user of the product, is among the class of persons designed to be protected by these regulations and certification standards.

76.     Defendants breached these duties by failing to exercise the required degree of care in designing, developing, testing, manufacturing, marketing, and distributing hearing protection devices in a manner to provide the specified level of hearing protection.

77.     The damages suffered by Plaintiff were or should have been reasonably foreseeable to Defendants.

78.     Plaintiff was damaged by Defendants' conduct, including but not limited to damage to his hearing.

79.     Defendants' breaches are a direct and proximate cause of the injuries and damages suffered by Plaintiff in an amount not yet fully determined, but in excess of $75,000, exclusive of costs and interest. Plaintiff is entitled to recover all damages and any relief at law or in equity, as a direct and proximate result of Defendants' conduct.


**COUNT II:**
**STRICT PRODUCTS LIABILITY – DESIGN DEFECT**
**And Design Defect under LSA-RS 9:2800.56**

80.     Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

81.     Defendants are the manufacturers and sellers of the defective Combat Arms™ Earplugs.

82.     The defective Combat Arms™ Earplugs that Defendants manufactured, distributed, and sold were, at the time they left Defendants' control, defectively designed in that the design of the earplug caused it to loosen in the wearer's ear, which allowed damaging sounds to enter the ear canal.

83.     The defective Combat Arms™ Earplugs that Defendants manufactured, distributed, and sold were, at the time they left Defendants' control, defective and unreasonably dangerous for their ordinary and expected use because they did not stop the damaging loud

noises of military use that can cause tinnitus, hearing loss, and/or other ear- and hearing-related injuries.

84.     The Combat Arms™ Earplugs that Defendants manufactured, distributed, and sold were, at the time they left Defendants' control, defective and not reasonably safe for the intended use.

85.     Defendants knew of the defects in the Combat Arms™ Earplugs.

86.     No reasonably prudent manufacturer would design, distribute, and sell an earplug with the knowledge possessed by Defendants, namely that the stem of the earplug was too short to fit correctly in many people's ears and that if not fitted correctly the earplugs would not guard against loud impulse noises and could cause tinnitus, hearing loss, and/or other ear- and hearing-related injuries.

87.     The Combat Arms™ Earplugs that the Defendants manufactured, distributed, and sold were delivered to Plaintiff without any change in their defective condition and were used by Plaintiff for the purposes and in a manner normally intended, namely for the protection and prevention of hearing loss.

88.     Defendants owed a duty of care to Plaintiff to design, manufacture, and sell earplugs that met the specified performance criteria and were otherwise fit for use by Service Members, including plaintiff herein, to protect them from damaging noises typically incurred in military service. Defendants breached this duty.

89.     Defendants owed a duty of care to Plaintiff to design and sell earplugs that were fit for use in military service and that performed according to the specifications that Defendants certified the Combat Arms™ Earplugs would meet. Defendants breached this duty.

90.     Defendants owed a duty of care to Plaintiff to design and sell earplugs that were safe when used for their intended purpose; i.e., when in the presence of loud impulse sounds. Defendants breached this duty.

91.     Plaintiff suffered injury and damage as a direct and proximate result of the defective and unreasonably, unsafe, dangerous condition of the Combat Arms™ Earplugs that the Defendants manufactured, distributed, and sold.

## COUNT III:
## STRICT PRODUCT LIABILITY – INADEQUATE WARNING
### and Warning Defect Under LSA-RS-9:2800.57

92.     Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

93.     Defendants are the manufacturers and sellers of the defective Combat Arms™ Earplugs.

94.     The defective Combat Arms™ Earplugs that Defendants manufactured, distributed, and sold were, at the time they left Defendants' control, defective because the earplugs did not come with adequate warnings, instructions, or labels.

95.     The Combat Arms™ Earplugs that Defendants manufactured, distributed, and sold were, at the time they left Defendants' control, defective because Defendants failed to warn, failed to provide instructions, and failed to provide an adequate label that included the modified fitting instructions necessary for the earplug to fit correctly in the wearer's ear and create the seal necessary to block out the damaging sounds.

96.     Defendants had a duty to manufacture, design, and sell the Combat Arms™ Earplugs with reasonable and due care for the safety and well-being of wearers, including Plaintiff.  Defendants breached that duty.

97.     Defendants had a duty to provide adequate warnings and/or instructions to prevent the risks associated with the Combat Arms™ Earplugs when worn in the ordinary course.  Defendants breached that duty.

98.     It was foreseeable to Defendants that the Combat Arms™ Earplugs would be unreasonably dangerous if distributed without the warning regarding the risks of damage to the ear with an improper fit and/or modified fitting instructions.

99.      Not only was it foreseeable, it *was foreseen* by Defendants. During testing, Defendants discovered that because the stem of the earplug was so short, it was difficult to insert the earplug deep enough into the wearer's ear canal to obtain a proper fit.

100.    Defendants also discovered that when the green end of the Combat Arms™ Earplug was inserted into the ear using the standard fitting instructions, the basal edge of the third flange of the yellow end pressed against the wearer's ear and folded backward. When the inward pressure of the earplug was released, the yellow flanges tended to return to their original shape, thereby loosening the earplug, often imperceptibly to the wearer.  And, because the Combat Arms™ Earplug was symmetrical, this same problem occurred when the earplug was reversed.

101.    Defendants had a post-sale duty to warn of the above alleged, product-related defects and risks because Defendants knew or reasonably should have known that the Combat Arms™ Earplugs posed a substantial risk of harm to Service Members, including Plaintiff. A product manufacturer is liable to Plaintiff for damages proximately caused by a characteristic of

the product rendering the product unreasonably dangerous when such damages which arose from Plaintiff's reasonably anticipated use. A warning or instruction showing how to correctly and safely use the Combat Arms™ Earplugs could have been effectively communicated to and acted upon by the Servicemembers to whom a warning or instruction might be provided; and the risk of harm, including, but not limited to hearing loss in Servicemembers, is sufficiently great to justify the slight burden of providing a warning or instruction. Defendants breached this duty by failing to provide a post-sale warning or instruction.

102. The Combat Arms™ Earplugs contained no warnings, or in the alternative, inadequate warnings and/or instructions, as to the risk that the Combat Arms™ Earplugs would allow damaging sounds to bypass the earplug thereby posing a serious risk to Plaintiff's hearing unbeknownst to Plaintiff.

103. The warnings and instructions that accompanied the Combat Arms™ Earplugs failed to provide the level of information that an ordinary wearer would expect when using the Combat Arms™ Earplugs in a manner reasonably foreseeable to Defendants.

104. Had Plaintiff received an adequate warning of the risk of tinnitus, hearing loss, and/or other ear- and hearing-related injuries, associated with the use of the defective Combat Arms™ Earplugs, he would have folded back the flange of the opposite end, and thus would not have suffered hearing loss.

105. Additionally, and/or alternatively, had Plaintiff received the modified fitting instructions that were used by Defendants during testing, and which were not disclosed to Plaintiff, Plaintiff would have followed the modified fitting instructions to ensure a proper seal to prevent damaging sounds from entering the ear canal.

106.     Plaintiff suffered injury and damage as a direct and proximate result of the Defendants' failures to warn and/or provide adequate instructions regarding the dangerous condition of the Combat Arms™ Earplugs that the Defendants manufactured, distributed, and sold. In the alternative, Defendants failed to provide plaintiff adequate warning despite later acquired knowledge of the defect after the product left its control.

## COUNT IV:
## UNREASONABLY DANGEROUS BECAUSE OF NONCONFORMITY TO EXPRESS WARRANTY - LA-RS-9:2800.57

107.     Plaintiff incorporates by reference the paragraphs above as if fully set forth herein.

108.     A product is unreasonably dangerous when it does not conform to an express warranty made at any time by the manufacturer about the product if the express warranty has induced the claimant or another person or entity to use the product and the claimant's damage was proximately caused because the express warranty was untrue.

109.     The Combat Arms™ Earplugs did not meet the express warranty claimed by Defendants (as more fully described above).  The false claims that the Combat Arms™ Earplugs met the specifications for prevention of hearing loss induced the wearers, such as Plaintiff herein, to use the product, and the Plaintiff's damage was proximately caused by that failure to meet the warranty.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests from Defendants, jointly and severally, compensatory damages, together with appropriate equitable relief, costs, and attorney's fees, as follows:

A.    Award of monetary damages, including compensatory relief, to which Plaintiff is entitled at the time of trial in an amount exceeding $75,000, exclusive of costs and interest.

B.    Award of pre- and post-judgment interest.

C.    Award of Costs

**D.**    Award of all such other and further relief as may be available at law or equity and may be proper under the circumstances.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted:
**READY LAW, L.L.C.**

*/S/ **Edward A. Ready***

_____

EDWARD A. READY (#32927)
2901 Ridgelake Drive, Suite 205
Metairie, Louisiana 70002
Telephone: (504) 292-7375
Facsimile:  (888) 265-8774
eaready@gmail.com